Filed 6/16/15  P. v. Jackson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ERIC JACKSON,<br><br>    Defendant and Appellant. | D065403<br><br><br>(Super. Ct. Nos. SCD246104, SCD235489, SCD246719) |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed as modified.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Eric Jackson of two counts of transportation of methamphetamine (Health & Saf. Code,[1] § 11379, subd. (a); counts 5 & 14); possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); count 7); possession of cocaine (§ 11350, subd. (a); count 8); possession of oxycodone (§ 11350, subd. (a); count 9); possession of methamphetamine (§ 11377, subd. (a); count 11); transportation of methamphetamine (§ 11352, subd. (a); count 12); and possession of methamphetamine for sale (§ 11378; count 15). The jury found true the allegation that Jackson was armed with a firearm in the commission of counts 8, 9, and 11 within the meaning of Penal Code section 12022, subdivision (a)(1). The jury also found the controlled substances in counts 12 and 14 were for personal use within the meaning of Penal Code section 1210, subdivision (a). The jury found true the allegation that Jackson was out on bail within the meaning of Penal Code section 12022.1, subdivision (b) during the commission of counts 5, 7, 9, 11, 12, 14, and 15.

The jury found Jackson not guilty of unlawful taking or driving of a vehicle. (Veh. Code, § 10851, subd. (a); count 3). The jury was not able to reach verdicts as to two counts of possession of a controlled substance for sale (§ 11378, counts 2 & 6); possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); count 4); and possession of heroin for sale (§ 11351, count 13). At the request of the prosecutor, the court dismissed counts 2, 4, 6, and 13 as well as counts 1 (possession of a firearm by a felon) and 10 (receiving a stolen vehicle; Pen. Code, § 496d).

---

[1] All further statutory references are to the Health & Safety Code unless otherwise indicated.

Jackson subsequently admitted two prior strike convictions, within the meaning of Penal Code sections 667, subdivisions (b) through (i) and 1170.12.

The court sentenced Jackson to prison for 13 years four months comprised of: three years on count 12 doubled to six for the prior strikes, two years on count 5, 16 months on count 7, and four years for the out-on-bail allegations. The court stayed Jackson's sentence under Penal Code section 654 as to counts 14 and 15 and concurrent terms were imposed on counts 8, 9, and 11.

Jackson appeals, contending substantial evidence does not support his convictions for counts 8, 9, 11, 12, 14, and 15; the jury's finding that he was out on bail in case number SDC235489 must be reversed because he was not released in that case at the time the offenses were committed; and the two-year enhancement imposed for the out-on-bail allegation should be stayed because he was not convicted of the underlying primary offense.

We agree that one of Jackson's two-year enhancements for the out-on-bail allegation should be stayed. However, we find no merit in Jackson's remaining arguments and affirm the judgment as modified.

FACTUAL BACKGROUND

Prosecution

March 5 and 6, 2013 (Counts 5, 7-9, 11)

On March 5, 2013, after receiving information that possible narcotics related activity was occurring at a house, Officer Schuyler Boyce of the San Diego Police Department conducted an undercover surveillance at a house located on Cherokee

3

Avenue. During the afternoon, a female, subsequently identified as Julie Rau, drove up to the house, parked her car, and went inside. Fifteen minutes later, Rau exited the house with Jackson. Rau and Jackson got into the car and drove off. Boyce requested that a marked patrol car follow them.

Officer Maria Humes and her partner Officer Mike Serrano subsequently conducted a traffic stop of the car being driven by Rau. Jackson was in the front passenger seat of the car. As they pulled the car over, both Jackson and Rau were looking down toward the center console area of the car. Jackson reached down to his left, toward the center arm rest. It appeared to the officers that Jackson was trying to conceal something.

The car was eventually searched. Officers recovered 6.51 grams of methamphetamine inside a small leather canister in the center armrest. Both Jackson and Rau were arrested. Jackson had $2,000 in his pocket. He claimed the money was for his rent. Serrano observed an electric monitoring device on Jackson's ankle, similar to one that people on bail sometimes wear, which Jackson claimed was placed on him by his bail bondsman.[2]

The following night, police executed a search warrant at the home on Cherokee Avenue. Several people, including Jackson's girlfriend, Lorena Lucas Hernandez, and Benjamin Gaspar were inside the house at the time. Inside the house, it appeared that two

---

[2]     Jackson was bailed out of jail, in case number SCD246104, on February 9, 2013. He was not convicted of any of the charges arising out of that case.

4

bedrooms were being occupied. In one of the bedrooms, police found items belonging to Gaspar.

In a second bedroom directly to the left of the front door, police found .12 grams of methamphetamine loose on a small table and .29 grams of methamphetamine in a Ziploc bag on top of a dresser. Also on the dresser were syringes, a digital scale, Ziploc baggies, a small spoon with heroin residue, several tablets of oxycodone, and .28 grams of cocaine. Police additionally found a nine millimeter handgun inside a backpack that was on the bed in the bedroom. Subsequent DNA testing concluded Jackson was a major contributor to DNA found on the weapon.[3] Additionally, in the same bedroom, officers located an electric bill in Lorena Lucas's name. Officers also found court documents that appeared to be an adoptive placement agreement between Franklin and Elaine Jackson for a minor child named Angel. Jackson's father is Franklin Jackson and Jackson's son is named Angel. Also, written in Spanish on a laundry basket found in the closet of the room was the phrase, "Eric and Lorena for life."

On March 30, 2013, Jackson was released from custody on bond.

April 7, 2013 (Counts 12, 14, 15)

On April 7, 2013, Chris Allshouse, a manager at a Big 5 store, observed Jackson acting "suspicious" inside the store. Jackson gathered a basket full of items then said he did not have money and asked for the items to be held for another day. Jackson began pacing near his car and getting in and out of it. He rummaged through the car's back seat,

---

[3]    Jackson's girlfriend also was a possible contributor to the DNA profile.

which contained "a bunch of stuff." Jackson pulled a knife out of a velvet purple Crown Royal bag from the back seat of the car. A woman also was in the car. After Allshouse saw Jackson with the knife, he called the police.[4]

Police, responding to the radio dispatch, observed the car travel south then pull into a parking lot and park. Officers pulled behind the car and stopped. Jackson got out of the car. He appeared "fidgety and hyperactive" and placed his hands in and out of his pockets. He was sweating profusely, had an unkempt appearance and bad body odor, consistent with symptoms of being under the influence of a controlled substance. Officer Howshawn Legrand observed that Jackson's left hand was bleeding. He thought that Jackson may have cut his hand on the knife he had been observed holding earlier. Believing Jackson was under the influence of a controlled substance, Legrand detained and handcuffed him. Jackson was mumbling. As Legrand was patting down Jackson's right jean pocket, he was poked by a hypodermic needle.

Officers subsequently searched the car, which belonged to the female occupant. On the right rear passenger seat, officers found a plush purple bag and a black zipper pouch. Inside the purple bag, officers found 27.37 grams of methamphetamine, 5.27 grams of heroin, and three glass pipes. Inside the black pouch were hypodermic needles. A purple Crown Royal bag, containing nothing of evidentiary value, was found next to the plush purple bag containing the drugs. Jackson told the officers, "This one's on me," and said he had a drug problem, he was out on bail, and he was trying to clean up his act.

---

[4]     This telephone call was played for the jury.

6

At the police station, Jackson's blood was drawn. Subsequent laboratory analysis determined the presence of several drugs in Jackson's blood, including methamphetamine and heroin.

## Jail Telephone Calls

Several recorded telephone calls made by Jackson while he was in jail were played for the jury. On February 4, 2013, during one such call, Jackson told an unknown male, "They caught me." Jackson additionally told "Vic," that "They got us when we went to the store."

In a February 5, 2013 telephone call, Jackson asked Louie Montoya to pick up his money in Linda Vista. He instructed Montoya to give a man named Victor a code word and stated Victor then would give him a bag with two "real expensive watches" and another bag with $6,000. Jackson further stated that there were a "couple zips of brown and a couple of zips" of "white shirts."[5] Jackson instructed Montoya to go to "Ben's house,"[6] to get "all [his] shit out of there," including three flat screen TVs and five laptops. He further stated he had a "bunch of new shit" at Gaspar's house.

Jackson told Montoya to make sure Lorena Lucas was alright and to give her "a couple hundred bucks," and a little "white shirt."

---

[5]    According to Detective Doyle, the reference to white and brown "shirts" was to methamphetamine and heroin, respectively. Additionally, a "zip" is an ounce of a substance.

[6]    Benjamin Gaspar was one of the residents of the house on Cherokee Avenue.

In a March 22, 2013 telephone call to Elizabeth Ellis, Ellis suggested that Jackson would have to marry Lorena Lucas to avoid having her testify against him. Jackson responded that "all [he] has to do is bury that bitch," or send her to Michoacán and he will "never see her again."

Defense

Art Fayer, a consultant in alternative sentencing and drug and alcohol rehabilitation assessments and placements, testified the minimum amount of methamphetamine used for personal use is a tenth of a gram. Some people, however, use as much as four to six grams per day. The average amount is probably two grams. A person would purchase as much as an ounce, or 28.3 grams, for their personal use. According to Fayer, it is reasonable to believe someone who had 6.7 grams of methamphetamine possessed it for personal use. Moreover, a person with an ounce of methamphetamine also could possess it for personal use.

Detective Maria Delgadillo testified she spoke to Rau after her arrest on March 5, 2013. Rau told her that the drugs were hers, and Jackson should not go to jail for them.

Jackson's mother testified that in February 2013, after Jackson was arrested, he called her and asked her to get money to bail him out of jail. She gave him $1,000. A cousin also gave Jackson $800.

DISCUSSION

I

*SUBSTANTIAL EVIDENCE*

A.  Jackson's Contentions

Jackson argues substantial evidence does not support his convictions under counts 8, 9, 11, 12, 14, and 15.  Counts 8, 9, and 11 involve items seized from the house on Cherokee Avenue.  Counts 12, 14, and 15 concern contraband found inside a bag recovered from a car that Jackson did not own.

B.  Standard of Review

When considering a defendant's challenge to the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether the record contains substantial evidence from which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  We do not reweigh evidence or reassess a witness's credibility and we presume the existence of every fact the trier of fact could reasonably deduce from the evidence.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)  We ask whether, after viewing the evidence in the light most favorable to the judgment, any rational trier of fact could have found the allegations to be true beyond a reasonable doubt.  (See *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding.  (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)

## C. Counts 8, 9, and 11

Count 8 (possession of cocaine; § 11350, subd. (a)), count 9 (possession of oxycodone; § 11350, subd. (a)), and count 11 (possession of methamphetamine; § 11377, subd. (a)) all stem from items seized from the house on Cherokee Avenue after law enforcement executed a search warrant. Jackson contends that his conviction under these counts must be reversed because the evidence did not establish that he possessed the narcotics or had dominion over and the right to control the items in the room where they were found. We disagree.

"The essential elements of the offense of unlawful possession of a controlled substance are actual or constructive possession in an amount sufficient to be used as a controlled substance with knowledge of its presence and its nature as a controlled substance. The elements may be proven by circumstantial evidence" (*People v. Rushing* (1989) 209 Cal.App.3d 618, 621), and by "any reasonable inferences drawn" from the evidence. (*People v. Estrada* (1965) 234 Cal.App.2d 136, 155.) In addition, "one may become criminally liable for possession for sale . . . of a controlled substance, based upon either actual or constructive possession of the substance." (*People v. Morante* (1999) 20 Cal.4th 403, 417.) "Constructive possession exists where a defendant maintains some control or right to control contraband that is in the actual possession of another." (*Ibid*.) Thus, the " 'narcotics need not be found on the person of the defendant; it is sufficient if they are deposited in a place under the possession and control of the accused. Exclusive possession of the premises is not necessary nor is physical possession of the drug of the essence.' " (*Estrada*, *supra*, at p. 155.) "A defendant does not avoid conviction if his

10

right to exercise dominion and control over the place where the contraband was located is shared with others." (*Rushing*, *supra*, at p. 622.)

But simply having access to a place, "without more, will not support a finding of unlawful possession." (*People v. Redrick* (1961) 55 Cal.2d 282, 285.) "[N]o sharp line can be drawn to distinguish the congeries of facts which will and that which will not constitute sufficient evidence of a defendant's knowledge of the presence of a narcotic in a place to which he had access, but not exclusive access, and over which he had some control, but not exclusive control." (*Id*. at p. 287.) Examples of "evidential factors which, added to nonexclusive dominion, will support a finding of knowing possession" (*ibid.*) include a "showing of consciousness of guilt" (*id*. at pp. 287-288) or "that the drug was found among defendant's personal effects." (*Id.* at p. 287.) "[T]he totality of circumstances will determine whether a defendant has exercised the requisite control over contraband in the hands of another." (*Armstrong v. Superior Court* (1990) 217 Cal.App.3d 535, 539.)

Here, we are satisfied that substantial evidence exists from which the trier of fact could reasonably determine that Jackson possessed the narcotics that were found inside the room at the house on Cherokee Avenue. Jackson was observed at the house on the day before the house was searched. When he left the house, he did so with methamphetamine and $2,000 in his possession.

Further, evidence supported the inference that Jackson had dominion and control over the room inside the house where the drugs were found. Jackson's DNA was on a gun found in a backpack inside the room. His girlfriend's electric bill was located in the

11

room.  Legal paperwork with the name "Jackson," referencing Jackson's father and son, also was found in the room where the drugs were seized.  Additionally, written in Spanish on a laundry basket found in the closet of the room was the phrase, "Eric and Lorena for life."

Moreover, in a telephone call made from jail, Jackson asked Louie Montoya to go to Gaspar's house to collect his belongings, including clothes, three televisions, and five laptop computers.  Gaspar was one of the residents of the house on Cherokee Avenue.  It can be reasonably inferred from this evidence that Jackson also resided at that house because he kept his belongings there.

Simply put, substantial evidence supports Jackson's convictions under counts 8, 9, and 11.

### D.  Counts 12, 14, and 15

Count 12 (transportation of heroin; § 11352, subd. (a)), count 14 (transportation of methamphetamine (§ 11379, subd. (a); and count 15 (possession of methamphetamine for sale; § 11378) arise from contraband found inside a purple bag recovered from a car in which Jackson was traveling.  Jackson argues his convictions under these counts must be reversed because the evidence is insufficient to establish he had knowledge of the drugs found in the bag.  We are not persuaded.

12

Carrying or conveying a usable quantity of a controlled substance with knowledge of its presence and illegal character establishes transportation of a controlled substance.[7] (§ 11379, subd. (a); *People v. Rogers* (1971) 5 Cal.3d 129, 133-134; *People v. Cortez* (1985) 166 Cal.App.3d 994, 998-999; *People v. Meza* (1995) 38 Cal.App.4th 1741, 1746.) The crime may be established by circumstantial evidence and any reasonable inferences drawn from that evidence. (*Ibid*.) "Further, '[k]nowledge of the presence of contraband and of its narcotic content may be inferred from the accused's conduct or statements at or near the time of his arrest.' " (*People v. Eckstrom* (1986) 187 Cal.App.3d 323, 331.)

Here, a reasonable inference from the totality of the evidence is that the narcotics found in the car belonged to Jackson. The narcotics were found in a purple bag in the back seat of a car in which Jackson was driving. Shortly before his arrest, Jackson was observed rummaging through the back seat of the car. Further, he was seen holding and going into the Crown Royal bag, which was located by police on the seat next to the purple bag containing the narcotics. Also, at the time of his arrest, Jackson was under the influence of methamphetamine and heroin, the two drugs found in the car. Jackson additionally had a hypodermic needle in his front pocket at the time of his arrest. Next to the bag containing the drugs, law enforcement located a black pouch containing hypodermic needles. And Jackson stated, "This one's on me," and offered the excuse that

---

[7]     Knowledge of the drug's presence also is an element in the crime of possession of a controlled substance for sale. (See *People v. Montero* (2007) 155 Cal.App.4th 1170, 1175.)

he had a drug problem. From this evidence, the jury reasonably could infer that Jackson had knowledge of the narcotics inside the bag in the car.

Also, to the extent Jackson challenges the evidence supporting the jury's finding that he had a right to control the narcotics, we reject this contention. When narcotics are found concealed in an area accessible to multiple individuals, there may be sufficient circumstantial evidence that each person is in joint possession of the drugs. (*People v. Busch* (2010) 187 Cal.App.4th 150, 162; *People v. Magana* (1979) 95 Cal.App.3d 453, 464; *People v. Sotelo* (1971) 18 Cal.App.3d 9, 20.) In such a situation, "the question of what persons had joint possession is one of fact." (*Ibid*.) Here, the same evidence that supports the jury's finding that Jackson had knowledge of the narcotics also allows the jury to reasonably infer he controlled the narcotics.

Jackson emphasizes that he did not own the car in which the bag containing the narcotics was found. However, this fact alone does not negate the evidence discussed above. Further, Jackson points out other inferences that can be drawn from the subject evidence. Yet, even if the circumstances also might be reasonably reconciled with a contrary finding, we do not reverse as long as the evidence reasonably justifies the jury's findings. (*People v. Nelson*, *supra,* 51 Cal.4th at p. 210.)

Jackson also claims *People v. Jenkins* (1979) 91 Cal.App.3d 579 (*Jenkins*) supports his position here. In *Jenkins*, there was evidence the defendant had been in the PCP laboratory. The defendant's fingerprints were on containers in the laboratory, but those containers did not contain chemicals used to manufacture PCP. (*Id*. at p. 582.) The court explained that "more than mere presence must be shown in order to prove

14

constructive possession: the People must also show that defendant had dominion and control over the contraband." (*Id*. at p. 584.) The court noted there was no evidence as to when the defendant touched the containers, where the items were or what was in them when he touched them, or that the contents of the containers were used in the manufacture of PCP. (*Id*. at p. 583.)

The court defined possession of the contraband as follows: "As far as constructive possession is concerned, it 'occurs when the accused maintains control or a right to control the contraband; possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, or to the joint dominion and control of the accused and another.' " (*Jenkins*, *supra*, 91 Cal.App.3d at p. 583, quoting *People v. Newman* (1971) 5 Cal.3d 48, 52.)

In considering whether an inference could be made that the defendant had dominion and control, the court in *Jenkins* explained that "[t]he inference of dominion and control is easily made when the contraband is discovered in a place over which the defendant has general dominion and control: his residence [citation], his automobile [citation], or his personal effects [citation]. However, when the contraband is located at premises other than those of the defendant, dominion and control may not be inferred solely from the fact of defendant's presence, even where the evidence shows knowledge of the presence of the drug and of its narcotic character." (*Jenkins*, *supra*, 91 Cal.App.3d at p. 584.)

15

The instant case is distinguishable from *Jenkins*, *supra,* 91 Cal.App.3d 579.  Here, Jackson was traveling in the car at the time the narcotics were in the car.  He was under the influence of both the narcotics found in the car and had a needle in his pocket when he was arrested.  Jackson also rummaged through the car and the bag containing the narcotics was easily accessible to him.  In contrast, in *Jenkins*, there was no evidence that the defendant was at the PCP laboratory during the manufacture of PCP or was involved in any way in the manufacturing process.  *Jenkins* is not instructive here.

In short, we conclude substantial evidence supports Jackson's convictions under counts 12, 14, and 15.

II

*THE TRUE FINDING THAT JACKSON WAS OUT ON BAIL*

Jackson next maintains the jury's true findings on the allegations that he was out on bail in case number SCD235489 must be reversed because the evidence was insufficient to establish that he was released in that case at the time he committed the offenses charged in counts 5 through 9, 11, 12, 14, and 15.  Although we agree that there existed an error on the verdict forms listing the wrong case, we conclude the jury's intention to convict Jackson of the crime charge was unmistakably expressed.  (See *People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272-1273; *People v. Jones* (1997) 58 Cal.App.4th 693, 710 (*Jones*).)

The charges in counts 1 through 4 of the information concerned an incident in August 2012, which culminated in Jackson's arrest in February 2013.  These charges were initially filed as case number SCD246104.  Counts 5 through 11 of the information

16

concerned the search of the home on Cherokee Avenue and Jackson's arrest the day after the search of the house, which occurred on or about March 5, 2013 (the Cherokee House Offenses). These charges were initially filed as case number SCD246719. Finally, counts 12 through 15 of the information concerned the April 7, 2013 Big 5 incident (Big 5 Offenses). These charges were initially filed as case number SCD235489.

The information further alleged that counts 5 through 11 were committed while Jackson was released on bail on an earlier felony offense, within the meaning of Penal Code section 12022.1, subdivision (b). The information did not specify the earlier offense applicable to these enhancements.

The verdict forms for the Cherokee House Offenses all included the following language: "And we further find that the above felony offense was committed while the said defendant, Eric Jackson, was released from custody on bail on, and on his own recognizance pending final judgment on an earlier felony offense SCD235489, within the meaning of Penal Code section 12022.1(b)."

Again, case number SCD235489 consists of the Big 5 Offenses. Jackson correctly notes that he could not have been on bail in case number SCD235489 when he committed the Cherokee House Offenses because the Big 5 Offenses occurred after the Cherokee House Offenses. However, this error in the verdict forms does not carry the day for Jackson.

The form of a verdict is immaterial, provided the intention to convict of the crime charged is unmistakably expressed. (*People v. Camacho*, *supra*, 171 Cal.App.4th at pp. 1272-1273; *Jones*, *supra*, 58 Cal.App.4th at p. 710.) A verdict must be given " 'a

17

reasonable intendment and be construed in light of the issues submitted to the [finder of fact] and the instructions of the court.' " (*Ibid.*) Technical defects or clerical errors in a verdict may be disregarded if the jury's intent to convict of a specified offense is unmistakably clear, and the accused's substantial rights suffered no prejudice. (*People v. Bolin* (1998) 18 Ca1.4th 297, 331.)

Here, notwithstanding the error on the verdict forms identifying the incorrect case number for which it was alleged Jackson was out on bail, the jury's intent to find the allegation true is clear. At trial, the evidence presented regarding Jackson's bail status was provided by San Diego Police Officer Michael Serrano, who testified when he arrested Jackson on March 5, 2013, he observed an electric monitoring device on Jackson's ankle, similar to one that people on bail sometimes wear, which Jackson claimed was placed on him by his bail bondsman. Further, Sheriff Department detentions information assistant, Anita Yescas, testified Jackson was bailed out of jail, in case number SCD246104, on February 9, 2013.

Moreover, during closing argument, after addressing the elements of transportation of a controlled substance in count 5, the prosecutor stated:

> "Now, the out-on-bail allegations. There's a lot of these so we're going to go through one and then we'll just -- kind of go quickly through the other ones. I know it's late. Do you remember what Maria Humes found on the defendant's ankle? Well, an ankle bracelet and she determined that the defendant was out on bail, but there's also evidence from Anita Yescas, who came and testified as to the jail records, that the defendant bailed out on February 9th. This arrest occurred on March 5th, so the defendant was out on bail when he was arrested for this offense."

In addition, the jury instruction provided on the released on-bail allegation was without any reference to any particular case numbers:

> "The defendant is also charged with the additional allegation in Counts 5, 6, 7, 8, 9, 11, 12, 13, 14 and 15 that defendant was out on bail on an earlier offense when the current offense was committed.
>
> "To prove this allegation, the People must prove that:
>
> "1. The defendant had a pending felony case;
>
> "2. The defendant was released from custody on bail while the felony was pending;
>
> "AND
>
> "3. The defendant committed another felony offense at the time he was arrested on bail."

Based on this record, the jury's intent to find true that Jackson committed the Cherokee House Offenses in counts 5, 7 through 9, and 11 while he was on bail following his February 2013 arrest is unmistakably clear regardless of the fact that flawed verdict forms were provided to the jury. As such, we conclude Jackson was not prejudiced by the clerical errors contained in the verdict forms.

### III

*THE ENHANCEMENTS UNDER PENAL CODE SECTION 12022.1*

Jackson argues, and the People concede, one of two out-on-bail enhancements imposed under Penal Code section 12022.1 should be stayed. We agree.

Penal Code section 12022.1, subdivision (b) provides a mandatory consecutive two-year sentence enhancement if a defendant committed a secondary offense during release on bail for an earlier primary offense. However, for an enhancement to apply, the

19

defendant must have been convicted of the primary offense. Conviction of the primary offense is an "essential prerequisite" to imposition of a Penal Code section 12022.1 enhancement. (*People v. Walker* (2002) 29 Cal.4th 577, 586; *People v. McClanahan* (1992) 3 Cal.4th 860, 869 ["[S]ection 12022.1 on-bail enhancements are not imposed unless the defendant is ultimately convicted of the 'primary' and 'secondary' offenses."].) Thus, "a conviction for the criminal charge on the primary offense is an essential prerequisite to the imposition of the [section 12022.1] 'on bail' enhancement." (*In re Ramey* (1999) 70 Cal.App.4th 508, 512.)

Here, the trial court imposed a two-year enhancement pursuant to Penal Code section 12022.1, subdivision (b) "two times for each release from custody." However, because Jackson was not convicted of any charge related to case number SCD246104 (counts 1-4), these charges cannot be used as a primary offense for which Jackson was convicted. Accordingly, the trial court, under Penal Code section 654, should have stayed one of the enhancements imposed pursuant to Penal Code section 12022.1, subdivision (b).

## DISPOSITION

The judgment is modified to stay the one of Jackson's two-year enhancements under Penal Code section 12022.1, subdivision (b). The superior court is directed to amend the abstract of judgment to reflect modification and forward an amended abstract

20

of judgment to the Department of Corrections and Rehabilitation.  In all other aspects, the judgment is affirmed.


HUFFMAN, J.

WE CONCUR:

BENKE, Acting P. J.

NARES, J.